OPINION OF THE COURT
Harold J. Hughes, J.
The plaintiff moves for summary judgment in this proceeding which has been converted to a declaratory judgment action.
Mr. Hase alleges that he took hiring examinations for positions with New York State entitled legal assistant I and II and alcohol beverage control investigator trainee. The petition alleges that the State has employed a double standard for the scoring of civil service examinations, with white males being *869 held to a higher criterion than blacks, hispanics, women, and other favored ethnic groups. It is alleged that women and other minority members with lower exam scores were hired instead of plaintiff. Mr. Hase claims that all of this came about because of Governor Cuomo’s Executive Order No. 6 (9 NYCRR 4.6) which directs the State Department of Civil Service and all State agencies to take affirmative action to hire minorities, women, disabled persons, and Vietnam-era veterans.
Plaintiff originally pursued his claims, unsuccessfully, before the Division of Human Rights (Matter of Hase v Governor’s Off., 124 AD2d 916), and in Federal District Court (Hase v New York State Dept. of Civ. Serv., US Dist Ct, ND NY, Sept. 12, 1986, 86-cv-465). The Attorney-General moved to dismiss this petition as barred by res judicata due to those prior decisions. In an opinion dated September 11, 1987, this court held that while the claims for individual relief were barred by the prior adverse determinations of the Division of Human Rights and the Federal District Court, this proceeding presented a justiciable controversy upon the question of whether Executive Order No. 6, calling for affirmative action in State hiring and promotion, violates NY Constitution, article V, § 6, which provides, in pertinent part, as follows: "Appointments and promotions in the civil service of the state and all of the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive”.
Consequently, the proceeding was converted to a declaratory judgment action upon that issue, and plaintiff made this motion for summary judgment. The briefs submitted on the motion cited the case of Matter of Broidrick v Lindsay (39 NY2d 641), wherein the Court of Appeals held the executive branch cannot implement an affirmative action plan without legislative authorization. The case raised a second legal challenge to Executive Order No. 6 beyond the conflict with the merit and fitness requirement of the State Constitution, with the question becoming whether the second theory of violation of the separation of powers should be considered. The determinative factor in favor of consideration is that the plaintiff is appearing pro se. He senses that he has not been dealt with fairly by the State of New York, but does not know the correct legal buttons to push. The best history of our courts is to strain to assist those without counsel. Here, liberally inter *870 preted, the questions posed by Mr. Hase are: (1) does a plan of government favoritism based upon race, sex and ethnic background square with a constitutional mandate of merit and fitness in hiring and advancement of public employees; and (2) has the Governor exceeded the bounds of his office by enacting an affirmative action plan not expressly authorized by a statute?
In order to permit the parties to brief the additional issue, the court notified plaintiff and the Attorney-General that it was considering the second legal challenge and afforded both the opportunity to submit briefs and affidavits on the question of statutory authority for Executive Order No. 6. The issue was fully submitted by receipt of the State’s brief on October 24, 1988.
The concept behind affirmative action is that the sins of the parent shall be visited upon the child. Because in the past some white males engaged in discrimination against blacks, women, hispanics, Aleuts, Samoans, American Indians, and Pacific Islanders, the government will favor these groups over white males in hiring and advancement. The methods of favoritism vary, but include zone scoring (see, McGowan v Burstein, 71 NY2d 729; Matter of Chiles v Burstein, 137 AD2d 81), and maintaining separate lists of candidates, one for white males and another for women and minority applicants. In the private sector, the State promotes affirmative action by coercing private companies seeking public contracts to hire a certain percentage of women and minority subcontractors and employees under threat of being blacklisted for failing to do so (New York State Asphalt Pavement Assn. v White, 138 Misc 2d 836). This court’s view of affirmative action is set forth in Matter of Callanan Indus. v White (131 Misc 2d 333, 335, affd 118 AD2d 167) as follows: "Government favoritism based upon race, sex, or ethnic background is wrong. It is wrong when South Africa gives the white race preferential treatment and it is wrong when New York State gives preferential government treatment to blacks, women, and people of certain ethnic backgrounds. The motive for the favoritism is irrelevant. Certainly, one of the main functions of government is to assist the poor and promote advancement of the underprivileged. However, that assistance should be determined by need and not the recipient’s color, sex, or country of origin. The goal of our society is that all citizens receive equal justice, and that government dispense its benefits with a blind eye to the *871 recipient’s color, sex or ethnic group * * *. Affirmative action programs do not further that goal.”
No thinking person can advance the proposition that an individual’s merit and fitness are determined by his or her sex, race, or ethnic background. Nonetheless, the Governor has implemented an affirmative action program whereby people are judged by such factors.
The question remains: has the Legislature authorized him to do so? The law with respect to the adoption and implementation of affirmative action policies is clearly set forth in Matter of Fullilove v Beame (48 NY2d 376, 379) as follows: "the desirability of adopting a policy of affirmative action in hiring practices, and mandating the same, is not a prerogative of the executive, but rather of the legislative branch”.
Thus, there must be legislative authorization for Executive Order No. 6, in order for it to be valid. The first argument advanced by the Attorney-General in his memorandum of October 21, 1988 is that, "Legislative authority for Executive Order No. 6 derives * * * from the general proscription against discriminatory hiring practices in Human Rights Law § 296”. Section 296 of the Executive Law prohibits unlawful discriminatory practices. It has been on the books since well before the Broidrick and Fullilove cases (supra) were decided. It is a legislative mandate to bar discrimination, not an authorization for the executive branch to create its own affirmative action policy. General language of a statute mandating nondiscrimination cannot be the basis for an affirmative action program created by the executive (Matter of Fullilove v Beame, supra, at 378).
The second source of legislative authority for Executive Order No. 6 put forth by the Attorney-General is the language of Executive Law § 296 (12) which provides: "Notwithstanding the provisions of subdivisions one, one-a and three-a of this section, it shall not be an unlawful discriminatory practice for an employer, employment agency, labor organization or joint labor-management committee to carry out a plan, approved by the division, to increase the employment of members of a minority group (as may be defined pursuant to the regulations of the division) which has a state-wide unemployment rate that is disproportionately high in comparison with the statewide unemployment rate of the general population. Any plan approved under this subdivision shall be in writing and the division’s approval under this subdivision shall be in writing *872 and the division’s approval thereof shall be for a limited period and may be rescinded at any time by the division”.
The Attorney-General argues that the foregoing "provision serves as legislative authority for all employers, including the Executive Branch of the State government, to establish such plan”. Once again, it is important to point out that subdivision (12) was effective May 9, 1969 (L 1969, ch 458), long before the Broidrick and Fullilove cases (supra) were decided. More importantly, NY Constitution, article V, § 6 requires that merit and fitness be the only considerations in the hiring and promotion of State workers, and reading Executive Law § 296 (12) as authorizing the Governor, as employer, to add an additional factor of minority status, would render the subdivision inconsistent with the State Constitution.
The next argument advanced by the Attorney-General is that in Clark v Cuomo (66 NY2d 185) the Court of Appeals recognized that at times a Governor can issue an executive order that is consistent with existing law, even if not authorized to do so by specific statutes. However, Clark was a case involving the implementation of already existing State policy, not the creation of a new social policy. The case more in point is Boreali v Axelrod (71 NY2d 1). There, the Legislature determined to restrict tobacco smoking in certain areas such as libraries, museums, theatres and public transportation facilities. The executive branch was dissatisfied with this approach and wished to ban tobacco smoking in almost all areas open to the public. Unsuccessful in his attempts to get the Legislature to do so, the Commissioner of Health decided to go ahead on his own, and issued administrative regulations so doing. In upholding the striking of the regulations, the Court of Appeals reiterated that the separation of powers doctrine prohibits the executive branch from implementing its view of social policy in areas reserved to the Legislature, and in which sphere that body has chosen not to act. In so doing, the Court of Appeals recognized that the great social policy issues of this State should be resolved by the elected members of the Legislature, and not by the executive.
The general language of the Federal statute cited by the Attorney-General (42 USC § 2000-e) cannot be read as empowering the Governor to enact a hiring plan that violates the State Constitution, and is not authorized by the State Legislature. Finally, the most glaring weakness in the positions advanced by the Attorney-General is that when the Legislature has chosen to grant power to the Governor to enact *873 affirmative action programs, it has done so with carefully crafted language. An example is Transportation Law §§ 427, 428, wherein the Legislature specifically authorized the Governor to establish procedures and guidelines for affirmative action programs in the awarding of public construction contracts. Similar legislation would exist if the Legislature wished the Governor to implement affirmative action with respect to the hiring and promotion of State workers.
The plaintiff will be awarded judgment declaring Executive Order No. 6 (9 NYCRR 4.6) to be invalid as having been enacted without legislative authority, and in violation of NY Constitution, article V, § 6.